# UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

FRANK BERKLEY HIPPENSTEEL, Jr.,   :
                                           :
               Plaintiff          :     No. 3:14-CV-1345
                                           :
         vs.               :     (Judge Nealon)
                                         :
CAROLYN W. COLVIN, Acting     :
Comissioner of Social Security,     :
                                         :
         Defendant        :

## MEMORANDUM

On July 14, 2014, Plaintiff, Frank Berkley Hippensteel, Jr., filed this instant appeal[1] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social Security Administration ("SSA") denying his applications for disability benefits ("DIB") and supplemental security income ("SSI")[2] under Titles II and XVI, respectively, of the Social Security Act, 42 U.S.C. §§ 401 et seq., 1381 et seq. (Doc. 1). The parties have fully briefed the appeal. For the reasons set forth below, the decision of the Commissioner denying Plaintiff's applications for DIB and SSI will be vacated.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

2. Supplemental security income is a needs-based program, and eligibility is not limited based on an applicant's date last insured.

## BACKGROUND

Plaintiff protectively filed[3] his first set of applications for DIB and SSI on August 4, 2009, alleging disability since November 1, 2005.  (Tr. 260-270).[4] These claims were initially denied by the Bureau of Disability Determination ("BDD").[5]  (Tr. 138-145).  On December 28, 2009, Plaintiff filed a written request for a hearing before an administrative law judge.  (Tr. 146-148).  On March 29, 2010, Plaintiff filed second applications for DIB and SSI, with an alleged onset date of December 4, 2009.  (Tr. 282-283, 293-299).  Regarding the first set of applications, a hearing was held on October 29, 2010, before administrative law judge Sharon Zanotto ("ALJ"), at which Plaintiff and a vocational expert, Sheryl Bustin, testified.  (Tr. 30).  On November 19, 2010, in regards to the first set of applications, the ALJ found Plaintiff not disabled.  (Tr. 106-120).  One (1) day later, on November 20, 2010, Plaintiff's second applications for DIB and SSI were

3.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4.  References to "(Tr. _)" are to pages of the administrative record transcript filed by Defendant as part of the Answer on October 16, 2014.  (Doc. 9).

5.  The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

granted, he was found disabled as of the date of the decision, and he was awarded

DIB and SSI.  (Tr. 202-205).  On December 2, 2010, Plaintiff requested that the

Appeals Council review the November 19, 2010 decision, in which the ALJ

denied his first set of applications for DIB and SSI.  (Tr. 198).

On June 1, 2012, the Appeals Council vacated the ALJ's decision rendered

on November 19, 2010 for Plaintiff's first set of applications, consolidated

Plaintiff's first and second applications for DIB and SSI, reopened the second

claim in which benefits were granted, and remanded the case for a second hearing

and re-adjudication of the entire period at issue for both the first and second set of

applications for DIB and SSI.  (Tr. 66-67, 132-136).  On October 12, 2012, a

second hearing was held before the ALJ, at which Plaintiff and vocational expert

Paul Anderson, testified.  (Tr. 60).

On November 8, 2012, the ALJ issued a decision denying Plaintiff's claims,

and effectively reversing the prior award of benefits from the grant of the second

applications, because, as will be explained in more detail infra, Plaintiff could

perform a less than the full range of light work with occasional lifting and carrying

of twenty (20) pounds, frequent lifting and carrying of up to ten (10) pounds,

standing or walking for one (1) hour, and sitting for eight (8) hours in an eight (8)

hour workday.  (Tr. 15-16).

3

On December 3, 2012, Plaintiff filed a request for review with the Appeals Council.  (Tr. 7).  On May 16, 2014, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review.  (Tr. 1-3).  Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on July 14, 2014.  (Doc. 1).  On October 16, 2014, Defendant filed an answer and transcript from the SSA proceedings.  (Docs. 8 and 9).  Plaintiff filed a brief in support of his complaint on November 25, 2014.  (Doc. 12).  Defendant filed a brief in opposition on January 29, 2015.  (Doc. 15).  Plaintiff did not file a reply brief.

Plaintiff was born in the United States on June 25, 1960, and at all times relevant to this matter was considered an "younger individual"[6] whose age would not seriously impact his ability to adjust to other work.  20 C.F.R. § 404.1563(c);  (Tr. 300).

Plaintiff can communicate in English, and has an eleventh grade education.  (Tr. 44, 321).  His employment records indicate that he previously worked in

---

6. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).  "Younger person.  If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45."  20 C.F.R. §§ 404.1563( c), citing Rule 201.17 in appendix 2.

construction, masonry, and landscaping.  (Tr. 303, 323).  The records of the SSA

reveal that Plaintiff had earnings in the years 1975 to 2006.  (Tr. 273).  His annual

earnings range from a low of no earnings in 1977, 1993 and 2003, and from 2005

to 2011, to a high of twenty-six thousand three hundred fourteen dollars and

fourteen cents ($26,314.14) in 2001.  (Tr. 273).

Plaintiff's amended alleged disability onset date is December 4, 2009.  (Tr.

13, 36-37, 277).   The impetus for his claimed disability is a combination of left-

sided weakness post cerebrovascular ("CVA") event, lumbar degenerative disc

disease, emphysema, substance abuse, and chronic obstructive pulmonary disease

("COPD").  (Tr. 14).

In a document entitled "Function Report - Adult" filed with the SSA in

September of 2009,  Plaintiff indicated that he lived in a house with his family.

(Tr. 311).  He noted that he did not take care of any other people or animals,

stayed at home from the time he woke up until he went to bed, was able to take

care of his personal needs, did not have sleep problems, prepared his own meals

daily, and did the laundry and mowed the lawn for an hour once a week.  (Tr. 311-

313).  He also indicated that he went outside twice a day, could walk a quarter of a

mile with a five (5) to ten (10) minute rest before resuming walking, and could go

out alone, but that he did not drive a car or go shopping.  (Tr. 313-314, 316).

5

When asked to check items which his "illnesses, injuries, or conditions affect,"

Plaintiff did <u>not</u> check squatting, bending, standing, reaching, walking, sitting,

kneeling, talking, hearing, stair climbing, seeing, memory, completing tasks,

concentration, understanding, following instructions, using hands, or getting along

with others.  (Tr. 316).

Regarding his concentration and memory, Plaintiff did not need reminders

to take care of his personal needs or to take his medicine.  (Tr. 312).  He was able

to pay bills, count change, handle a savings account, and use a checkbook.  (Tr.

314).   He stated he was able to pay attention for a "long time," could follow

written and spoken instructions "good," and was able to finish what he started.

(Tr. 316).

Socially, Plaintiff watched television and fished, and was able to do these

things "good."  (Tr. 315).  He reported that he got along "good" with others,

including authority figures.  (Tr. 316-317).  He stated that he handled stress and

change "good."  (Tr. 317).

In the Supplemental Function Questionnaire also filled out in September of

2009, Plaintiff stated that his pain began in 1988, and included lower back pain

and shortness of breath.  (Tr. 319).  He indicated that his pain did not spread

anywhere else, but that it occurred often, and on and off all day.  (Tr. 319).  His

pain and breathing problems had not changed his eating habits nor did it cause weight fluctuations. (Tr. 320). He had not been taking pain medication, using assistive devices, or attending physical therapy at the time he filled out the questionnaire. (Tr. 320).

On April 16, 2011, Plaintiff filled out another Adult Function Report. (Tr. 368). He stated that from the time he woke up until he went to bed, he would take his medicine, watch television, shower, brush his teeth, have breakfast and lunch, walk one (1) block to see his friend, come home, watch more television, have dinner, and then sit outside if the weather was nice. (Tr. 368). He indicated that he did not care for any other people or animals, that he was unable to do yard work or fish since his stroke in December of 2009, and that his left leg pain would wake him up. (Tr. 368-369, 372). He was able to take care of his personal care needs, and did not need reminders to do so or to take his medicine. (Tr. 370). He was able to prepare sandwiches, but his brother-in-law would make his dinner because he could not "cook a full course meal." (Tr. 370). He was able to mow the lawn by using a riding mower for about one (1) hour with a break. (Tr. 370). He was able to go out alone and walk about half a block with a ten (10) minute break needed before resuming walking, but that he did not go anywhere on a daily basis because his "legs [were] always giving out on [him]." (Tr. 371, 373). He

indicated that he did not shop.  (Tr. 371).  He was able to county change, handle a

savings account, and use a checkbook, but did not pay bills because he did not

have any money to do so.  (Tr. 371).  When asked to check the items that his

"illnesses, injuries, or conditions affect," Plaintiff did not check standing,

reaching, sitting, talking, hearing, seeing, memory, completing tasks,

concentration, understanding, following instructions, using hands, or getting along

with others.  (Tr. 373).  He indicated that he was able to follow written and spoken

instructions and changes in routine "well," but that he only moderately handles

stress.  (Tr. 374).  When asked to provide additional information he did not

provide in earlier parts of the form, Plaintiff stated:

> Cannot do anything I use[d] to be able to do due to my stroke.
> I use[d] to do a lot of fishing, garden work, yard work, [and]
> help neighbors [,but] now I can't do any of these things
> because my legs give out on me or it all hurts, [including] my
> back.  My arms are not as strong as they were before my stroke.

(Tr. 375).

Plaintiff also filled out a Supplemental Function Questionnaire in April of

2011.  (Tr. 376).  Plaintiff stated that his pain began on December 4, 2009 due to a

stroke, and that his legs hurt all the time, mainly on his left side which was

affected by the stroke.  (Tr. 376).  He stated the nature of his pain had changed

since it began because his legs would give out more often and his left arm was

hurting more.  (Tr. 376).  The pain spread down his legs, arms, and back, and

bending, walking, pushing, and pulling made the pain worse.  (Tr. 376).  His pain

occurred when walking and using his arms, that necessitated breaks.  (Tr. 376).

When asked how long his pain lasted, he responded that it lasted until he took a

break.  (Tr. 376).  He was taking Tylenol for the pain, which helped for about two

(2) hours after taking it.  (Tr. 377).

 At his October 12, 2012 hearing[7], Plaintiff was attempting to recover

benefits for the time period of December 4, 2009 through November 19, 2010

because benefits were granted in the Plaintiff's second application for DIB and

SSI from November 20, 2010 to the date of the ALJ's decision.  (Tr. 66).  The ALJ

explained that she read the decision issued by the Appeals Council that remanded

the case back to her to mean that both the first and second applications for DIB

and SSI were consolidated and the matter was remanded to her for her to decide

both the first and second applications, which would null and void the grant of

benefits Plaintiff received from the grant of the second applications for DIB and

SSI.  (Tr. 66-68).

 At this hearing, Plaintiff alleged that the following combination of physical

_____

7.  Because Plaintiff's first and second applications for DIB and SSI were
consolidated and remanded, this Court will only be reviewing the relevant hearing
held on October 12, 2012 to adjudicate both sets of applications.

impairments prevented him from being able to work since December of 2009:

emphysema, COPD, left-sided weakness as a result of a stroke, mild mid to lower

lumbar fact arthritis, non-severe hypertension, and substance abuse.  (Tr. 71, 73).

He testified that he had not worked since December 4, 2009, because his left side

and leg would "go[] out on [him,]" he could not walk far, and he was "lucky" if he

could lift ten (10) to fifteen (15) pounds.  (Tr. 72).  He testified that he got his

license back after losing it in 1980 due to three (3) DUI's, but that he did not drive

because he did not prefer to.  (Tr. 73).  With regards to Plaintiff's COPD, he

testified that dust, fumes, odors, chemicals, and gases did not cause him any

problems, but that extreme temperatures did.  (Tr. 74-75).  He was still smoking at

the time of the hearing, in the amount of ten (10) to fifteen (15) cigarettes a day.

(Tr. 75).  He was using inhalers every day to manage his breathing problems, and

they caused him to be able to breathe "a lot better."  (Tr. 77).  His main complaint

with regards to his breathing issues was that he felt he had to gasp for air, which

was exacerbated by lying down, moving around, and being outside when it was

windy.  (Tr. 77).  However, he testified that he did not have allergies that would

exacerbate his COPD.  (Tr. 77).  When he would gasp for air, the problem would

last usually about two (2) minutes until he could get his lungs "back full of air."

(Tr. 78).  He testified that he experienced lower back pain after stooping five (5) to

six (6) times.  (Tr. 79).  He did not have a problem with crouching when using his

knees to do so, but did experience back pain when crouching with just his back.

(Tr. 80).  He did not have difficulty balancing, reaching, using his hands and arms

to move things like a tissue box or groceries, using his fingers to pick up fine

objects like a coin, pushing or pulling with his arms or legs, or kneeling.  (Tr. 80,

83).  He experienced pain after using the stairs multiple times a day, which caused

him to stay mainly downstairs.  (Tr. 80-81).  Regarding his left side, Plaintiff

testified that his calves would stiffen after walking half a block, which required

him to stop and take a five (5) to ten (10) minute rest, and that his left hand would

give out on him "quite a bit."  (Tr. 81).  An example he gave was that a soda can

would sometimes slide out of his left hand.  (Tr. 81).  He testified that he did not

have a problem standing, and that the heaviest thing he had lifted since February

of 2009 was about ten (10) to fifteen (15) pounds, including a cinder block.  (Tr.

84).  He was able to carry groceries and the laundry.  (Tr. 84).

**MEDICAL RECORDS**

Plaintiff's relevant medical records will now be reviewed.  Because the ALJ

considered evidence from October 6, 2009 in evaluating Plaintiff's applications

for DIB and SSI, this Court will review this medical evidence, even though it

predates the alleged onset date of December 4, 2009, the date Plaintiff had a

stroke.

On October 6, 2009, Ronald Vandergriff, D.O. performed a consultative examination on Plaintiff. (Tr. 415). Plaintiff reported that his lower back bothered him all the time, but that he had not seen a specialist or his family doctor for this problem nor had he been taking any medications. (Tr. 415). It was noted that Plaintiff smoked a pack of cigarettes a day, and drank twelve (12) beers daily. (Tr. 416). He reported that he stopped working because he had been unable to lift anymore. (Tr. 416). A lumbar spine x-ray revealed vertebral body endplate osteophytes and facet arthritic change in his lower back. (Tr. 416, 423). Plaintiff was able to get on and off the exam table on his own, and was able to ambulate and speak in complete sentences without any shortness of breath or difficulty. (Tr. 417). His back exam showed no deformities, erythema, or swelling, that his back was not tender, and that his range of motion ("ROM") was normal. (Tr. 417, 422-423). Dr. Vandergriff recommended that Plaintiff have a complete work-up done by a family physician, and that he undergo a physical therapy evaluation for his lower back. (Tr. 417-418). Dr. Vandergriff also recommended that Plaintiff quit smoking. (Tr. 418). Dr. Vandergriff opined that Plaintiff could frequently lift and carry up to ten (10) pounds, could occasionally lift and carry up to twenty (20) pounds, could stand and walk for four (4) hours in an eight (8) hour workday,

could sit for eight (8) hours, was unlimited in pushing and pulling, could occasionally bend and kneel, could never stoop, crouch, balance, or climb, and was not able to engage in activity that involved heights.  (Tr. 419-420).

On December 4, 2009, Plaintiff presented to the emergency room ("ER") at Carlisle Regional Medical Center ("CRMC") after "attempting to climb a flight of stairs when he 'blacked out and fell down'" which resulted in head trauma and left-sided weakness.  (Tr. 427-428).  His work-up revealed mild atherosclerotic plaquing bilaterally in his carotid artery and chronic vascular changes and a subacute right pontine infarct in his brain, for which Plaintiff was placed on aspirin and Plavix.  (Tr. 428, 437).   Plaintiff was diagnosed with a cerebrovascular accident ("CVA"), otherwise known as a stroke.  (Tr. 427-428, 437).  An exam performed by Dr. Ismail revealed that Plaintiff had left-sided weakness that improved to the point where he did not need ambulatory assistance, some mild to moderate residual weakness in his upper left extremity that improved after undergoing physical therapy in the hospital, and a left facial droop, decreased sensation on the left side of his face due to several damaged cranial nerves, a tongue drift to the right, clear speech, and clear, unlabored breathing and breath sounds.  (Tr. 429, 432, 443).  His motor strength test resulted in a five (5) out of five (5) in his upper and lower right extremities, but a three (3) out of five (5) in

his left upper and lower extremities.  (Tr. 432).  He was found to be "too high

functioning for additional rehabilitation in the inpatient rehab unit," but was

instructed to attend outpatient physical therapy.  (Tr. 429).  Plaintiff also

experienced alcohol withdrawal, and was counseled on the "need for abstinence

from alcohol and tobacco products."  (Tr. 429).  Plaintiff admitted that he had

COPD and emphysema, which caused shortness of breath when he walked, but

that he was not taking any maintenance medications.  (Tr. 431).  He also admitted

that he smoked one (1) pack of cigarettes a day and consumed approximately six

(6) to twelve (12) beer daily.  (Tr. 431).  He was discharged on December 14, 2009

with diagnoses including acute right pontine infarct (a stroke), acute alcohol

withdrawal, and hypertension, and was instructed to follow-up with a primary care

physician.  (Tr. 428-429).

On December 14, 2009, Dr. David Albright opined that Plaintiff was

temporarily disabled for a period of twelve (12) months or more when completing

a Pennsylvania Department of Public Welfare Employment Assessment Form due

to a CVA and hypertension.  (Tr. 424-425).  His assessment was based on a

physical examination, a review of Plaintiff's medical records, and a review of his

clinical history.  (Tr. 425).

On December 16, 2009, Plaintiff had an appointment with Mary Catharine

14

Sneider as a follow-up after his December 4, 2009 stroke was diagnosed at the ER. (Tr. 467).  Plaintiff reported that he had not been drinking alcohol, but was still smoking cigarettes.  (Tr. 467).  He reported continued left-sided weakness.  (Tr. 467).  His exam revealed a decreased sensation on the left side of his forehead, a slight, left-sided facial droop, a decreased grip strength in his left hand, a decreased strength in his lower left extremity at a four (4) out of five (5), and a slight gait dysfunction.  (Tr. 468).  Dr. Sneider encouraged smoking cessation, and prescribed Lopressor.  (Tr. 468).

On January 15, 2010, Plaintiff had a follow-up appointment with Dr. Sneider.  (Tr. 469).  Plaintiff reported that he was walking better, doing light exercises at home, did not have anymore falls, felt a slight imbalance problem, was able to wake at night to put wood into the stove, still had some slurring of his speech and a decreased sensation in his face, and improved overall without being back to his former self.  (Tr. 469).  He had abstained from alcohol use, but was still smoking about three quarters of a pack of cigarettes daily.  (Tr. 469-470).  His exam revealed a decreased sensation on the left side of his forehead, a slight, left-sided facial droop, a decreased grip strength in his left hand, a decreased strength in his lower left extremity at a four (4) out of five (5), and a slight gait dysfunction.  (Tr. 470).  He was instructed to engage in a smoking cessation

15

program, and to continue taking Lopressor.  (Tr. 470).

On April 15, 2010, Plaintiff had a follow-up appointment with Dr. Sneider. (Tr. 472).  Plaintiff reported that he had been smoking three quarters of a pack of cigarettes a day, and had not been exercising.  (Tr. 473).  His exam revealed a decreased sensation on the left side of his forehead, a slight, left-sided facial droop, a decreased grip strength in his left hand, a decreased strength in his lower left extremity at a four (4) out of five (5), and a slight gait dysfunction.  (Tr. 473). His hypertension was noted as poorly controlled, and Dr. Sneider prescribed Lopressor and Lisinopril as a result.  (Tr. 473).  He was encouraged to engage in a smoking cessation program, and was referred to Dr. Mira for bilateral wrist pain. (Tr. 473-474).

On May 12, 2010, Dr. Sneider wrote a letter concerning Plaintiff's visit to her on December 16, 2009 for a follow-up after the acute stroke he was diagnosed with during his visit to the ER on December 4, 2009.  (Tr. 465).  In this letter, Dr. Sneider stated that Plaintiff was under her care for hypertension, stable back pain, and emphysema.  (Tr. 465).  She listed the following medications Plaintiff was taking: Aspirin, Lopressor, and Lisinopril-HCTZ.  (Tr. 465).  She opined that it was not likely that Plaintiff would fully recover his left-sided strength, but that his facial droop and speech improved since the CVA in December of 2009.  (Tr. 465).

16

She opined that he was not able to perform his job as a mason laborer, and she recommended a full functional assessment exam to determine his exact degree of impairment and the extent of his limitations to perform job duties.  (Tr. 465).

On May 28, 2010, Allan Mira, M.D. performed a drainage of ganglion cysts from Plaintiff's left wrist.  (Tr. 505).  The surgery was performed without incident. (Tr. 505).

On August 13, 2010, Plaintiff had an appointment with Dr. Sneider. Plaintiff reported that he generally was well and his wrist had been doing well, but that he had been experiencing body aches from his hips down.  (Tr. 560).  It was noted that his blood pressure had improved, but that the Lisinopril caused a minor cough and that he had still been experiencing left-sided weakness.  (Tr. 560).  His exam revealed a decreased sensation on the left side of his forehead, a slight facial droop on the left side, a decreased grip strength in his left hand, decreased strength in his lower left extremity at a four (4) out of five (5), and slight gait dysfunction. (Tr. 561).  He was encouraged to quit smoking, and was prescribed Lopressor and Lisinopril.  (Tr. 562).

On October 8, 2010 and November 5, 2010, Plaintiff had follow-up appointments with Dr. Sneider.  (Tr. 509).  The notes from these visits are largely illegible.  (Tr. 508-512).  What can be gleaned from these visits is that Plaintiff

had a "CVA bruit." (Tr. 511). On October 12, 2010, Plaintiff underwent a carotid duplex study performed by Dr. Christopher Ladd, which showed an intimal irregularity bilaterally in his carotid. (Tr. 512). The impression states, "there has been no interval change. Findings are again consistent with a less than 40% diameter reducing stenosis of both carotid arteries." (Tr. 512).

On November 15, 2010, Plaintiff had an appointment with Dr. Gbadouwey at Lung, Asthma, and Sleep Associates, P.C. (Tr. 550). Plaintiff reported that he had a history of smoking at least one (1) pack of cigarettes a day since age thirteen (13), and that he continued to smoke, despite being advised to quit. (Tr. 550). He also admitted to alcohol consumption at the rate of two (2) to three (3) beers on the weekend. (Tr. 550). He was unwilling to try the nicotine patch because he could not afford it. (Tr. 550). He reported that he experienced a non-productive cough. (Tr. 550). His medications list included Aspirin, Metoprolol, Prinzied, and Zocor. (Tr. 550). An exam revealed that his cranial nerves two (2) through twelve (12) were normal, his lungs were clear, and he had no joint swelling or tenderness. (Tr. 551). His assessment included diagnoses of hypertension, COPD, hypercholesterolemia, and stroke syndrome. (Tr. 551). Plaintiff was scheduled for several tests and was instructed to follow-up with Dr. Gbadouwey in three (3) weeks. (Tr. 551).

18

On November 19, 2010, Plaintiff underwent a high resolution CT scan of the thorax, which revealed scarring in the base of his left lung, with an otherwise negative exam.  (Tr. 555).

On December 9, 2010, Plaintiff underwent pulmonary function tests.  (Tr. 556).  These tests revealed that there was a moderate obstructive ventilatory defect, no restrictive ventilatory defect, and a mild reduction in diffusion capacity, uncorrected for the hemoglobin.  (Tr. 556).  Plaintiff then underwent a Six Minute Walk Study.  (Tr. 557).  This test revealed that Plaintiff's oxygen saturation remained within normal limits during the test, and that no oxygen was needed at rest or with activity.  (Tr. 557).

On December 16, 2010, Plaintiff had a follow-up appointment with Dr. Gbadouwey.  (Tr. 547).  It was noted that Plaintiff had continued to smoke cigarettes, despite being advised to quit.  (Tr. 547).  Plaintiff reported that his breathing had improved with use of the Albuterol, Spiriva, and Advair inhalers. (Tr. 547).  An exam revealed that his cranial nerves two (2) through twelve (12) were normal, his lungs were clear, and he had no joint swelling or tenderness.  (Tr. 548). His medications list included Aspirin, Metoprolol, Prinzide, and Zocor.  (Tr. 547).  His assessment included diagnoses of hypertension, COPD, hypercholesterolemia, and stroke syndrome.  (Tr. 548).  Plaintiff was prescribed

Ventolin, was given samples of Spiriva and Advair, and was scheduled to follow-up with Dr. Gbadouwey in six (6) weeks.  (Tr. 548-549).

On December 20, 2010, Plaintiff had an appointment with physical therapist Kristin Zwemer for left-sided weakness he experienced as a result of his December 2009 stroke.  (Tr. 607).  Plaintiff stated that because he did not have insurance, he did not have much therapy after the stroke occurred.  (Tr. 607).  His past medical history was significant for arthritis, CVA, high blood pressure, and emphysema.  (Tr. 607).  His medications list included Aspirin, Lisinopril, Lopressor, Zocor, Spiriva, and Advair.  (Tr. 607).  His exam noted that he had decreased left knee control and stance, trouble grading his movement, and limited coordination of his left side, but that he was otherwise within normal limits.  (Tr. 607).  His left lower extremity strength was a three (3) out of five (5), his right lower extremity was a four (4) out of five (5), and he was able to ambulate.  (Tr. 607-608).  Her plan was to see Plaintiff two (2) to three (3) times a week to improve ambulation up and down stairs and to improve his strength.  (Tr. 608).

On January 27, 2011, Plaintiff had an appointment with Dr. Gbadouwey for follow-up of his moderate COPD.  (Tr. 545).  It was noted that Plaintiff had continued to smoke cigarettes, despite being advised to quit.  (Tr. 545).  Plaintiff reported that his breathing had improved with use of the Albuterol, Spiriva, and

Advair inhalers.  (Tr. 545).  An exam revealed that his cranial nerves two (2) through twelve (12) were normal, his lungs were clear, and he had no joint swelling or tenderness.  (Tr. 546). His medications list included Aspirin, Metoprolol, Prinzide, Zocor, and Ventolin.  (Tr. 545).  His assessment included diagnoses of hypertension, COPD, and hypercholesterolemia. (Tr. 546).  Plaintiff was given samples Spiriva and Advair.  (Tr. 546).

On April 27, 2011, Plaintiff had an appointment with Dr. Gbadouwey.  (Tr. 542).  It was noted that Plaintiff had continued to smoke cigarettes, despite being advised to quit.  (Tr. 542).  Plaintiff reported that his breathing had improved with use of the Albuterol, Spiriva, and Advair inhalers.  (Tr. 542).  An exam revealed that his cranial nerves two (2) through twelve (12) were normal, his lungs were clear, and he had no joint swelling or tenderness.  (Tr. 543). His medications list included Aspirin, Metoprolol, Prinzide, Zocor, and Ventolin.  (Tr. 542).  His assessment included diagnoses of hypertension, COPD, hypercholesterolemia, and stroke syndrome.  (Tr. 543).  Plaintiff was prescribed Spiriva and Advair, and was scheduled to follow-up with Dr. Gbadouwey in three (3) months.  (Tr. 543).

On May 10, 2011, Jerry Brenner, D.O., a non-examining state agency physician, filled out an Residual Functional Capacity ("RFC") form.  (Tr. 124-127).  In this form, after looking over Plaintiff's medical records up to that date,

Dr. Brenner found Plaintiff had the following functional limitations in relation to a competitive, eight (8) hour day, five (5) day a week workweek: (1) Plaintiff could occasionally lift and/ or carry up to twenty (20) pounds and frequently lift and/ or carry up to ten (10) pounds; (2) Plaintiff could stand and/ or walk for up to four (4) hours and sit with normal breaks for up to six (6) hours; (3) Plaintiff was unlimited in pushing and pulling within the aforementioned weight limits; (4) Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, and craw; (5) Plaintiff could never climb ladders, ropes, or scaffolds; (6) Plaintiff was limited in fingering with his left hand; and (7) Plaintiff did not have any visual, communicative, or environmental limitations. (Tr. 125-127).

On July 13, 2011, Plaintiff had a follow-up appointment with Dr. Gbadouwey for his moderate COPD. (Tr. 539). Plaintiff reported that he had continued to smoke, and that his breathing had improved with use of the Albuterol, Spiriva, and Advair inhalers. (Tr. 539). An exam revealed that his cranial nerves two (2) through twelve (12) were normal, his lungs were clear, and he had no joint swelling or tenderness. (Tr. 540). His medications list included Aspirin, Metoprolol, Lisinopril, Simvastat, Ventolin, Spiriva, and Advair. (Tr. 541). Plaintiff was instructed to continue taking his medications, and was scheduled to follow-up with Dr. Gbadouwey in three (3) months.

22

On October 10, 2011, Plaintiff had a follow-up appointment with Dr. Gbadouwey.  (Tr. 536).  Plaintiff denied coughing, a fever, chills, night sweats, and dyspnea, and reported an improvement in his breathing due to Albuterol, Spiriva, and Advair inhalers.  (Tr. 536).  He was noted as being at a "baseline level of functioning."  (Tr. 536).  Plaintiff reported that he had been drinking alcohol, at the rate of two (2) to three (3) beers on the weekend, and admitted he had continued smoking cigarettes.  (Tr. 536).  His medications list included Aspirin, Metoprolol, Lisinopril, Simvastat, Ventolin, Spiriva, and Advair.  (Tr. 536).  An exam revealed that his cranial nerves two (2) through twelve (12) were normal, his lungs were clear, and he had no joint swelling or tenderness.  (Tr. 537).  His assessment noted that he had hypertension and COPD, and he was instructed to keep taking his medications and follow up with Dr. Sneider in six (6) months.  (Tr. 537).

On April 11, 2012, Plaintiff had an appointment with Dr. Gbadouwey for his COPD.  (Tr. 599).  Plaintiff continued to smoke, despite being advised to quit, and reported that his symptoms improved with the use of inhalers.  (Tr. 599).  His medications list included Aspirin, Metoprolol, Lisinopril, Simvastat, Ventolin, Spiriva, and Advair.  (Tr. 599).  An exam revealed that his cranial nerves two (2) through twelve (12) were normal, his lungs were clear, and he had no joint

swelling or tenderness.  (Tr. 600).  His assessment noted that he had hypertension, COPD, hypercholesterolemia, and stroke syndrome.  (Tr. 600).  Plaintiff was instructed to keep taking his medications, and follow up with Dr. Sneider in six (6) months.  (Tr. 600-601).

On May 12, 2012, Dr. Sneider filled out a form for Plaintiff regarding his impairments and limitations.  (Tr. 567-574).  Dr. Sneider diagnosed Plaintiff with a CVA/ stroke, and gave him a fair prognosis.  (Tr. 567).  The clinical findings that support this diagnosis were a facial droop, left-sided weakness, and gait dysfunction, and the laboratory and diagnostic test results that support this diagnosis included an MRI of the brain and a CT scan of the head.  (Tr. 567-568). Dr. Sneider stated that Plaintiff's symptoms and functional limitations were reasonably consistent with his physical impairments as described.  (Tr. 568).  Dr. Sneider stated Plaintiff did not have pain.  (Tr. 568).  Dr. Sneider opined that Plaintiff could sit for up to one (1) hour and stand or walk for up to one (1) hour in an eight (8) hour work day in a competitive five (5) day a week workweek.  (Tr. 569).  Dr. Sneider also opined that is would be necessary or medically recommended that Plaintiff not sit, stand, or walk continuously in a work setting. (Tr. 569-570).  Dr. Sneider opined Plaintiff could occasionally lift and/ or carry up to twenty (20) pounds, but never lift and/ or carry anything over twenty (20)

pounds.  (Tr. 570).  She also opined that Plaintiff had significant limitations in doing repetitive reaching, handling, fingering or lifting because repetitive movements worsened Plaintiff's left-side weakness.  (Tr. 570).  In terms of the degree of limitation Plaintiff would have in a competitive eight (8) hour workday, Dr. Sneider opined Plaintiff could engage in minimal grasping, turning or twisting objects bilaterally, minimal use of fingers and hands for fine manipulations bilaterally, and minimal use of arms for reaching, including overhead, bilaterally.  (Tr. 570-571).  Dr. Sneider stated that Plaintiff had reached his maximum therapeutic benefit from physical therapy and occupational therapy.  (Tr. 571).  Dr. Sneider stated that Plaintiff's pain, fatigue and other symptoms were never to seldom severe enough to interfere with attention or concentration, but that he was incapable of even low stress work.  (Tr. 572).  Dr. Sneider opined that Plaintiff's impairments were ongoing and would last at least twelve (12) months.  (Tr. 572).  Dr. Sneider stated that Plaintiff's impairments were not likely to produce "good days" and "bad days."  (Tr. 573).  Lastly, Dr. Sneider stated that Plaintiff not engage in pushing, pulling, kneeling, bending, or stooping.  (Tr. 573).

On May 17, 2012, Plaintiff had an appointment with Dr. Gbadouwey for a follow-up of his COPD and to have Dr. Gbadouwey fill out a pulmonary impairment questionnaire.  (Tr. 596).  Plaintiff reported that he continued to

smoke cigarettes and drank about two (2) to three (3) beers on the weekend, but that he had improvement with his inhalers. (Tr. 596). His medications list included Aspirin, Metoprolol, Lisinopril, Simvastatin, Ventolin, Spiriva, and Advair. (Tr. 596-597). His exam revealed that his cranial nerves two (2) through twelve (12) were normal, and that his lungs were clear. (Tr. 597). His diagnoses included hypertension, COPD, and stroke syndrome. (Tr. 598). Plaintiff was scheduled for more pulmonary function tests, a six minute walk study, and a follow-up in three (3) months. (Tr. 598). At this appointment, Dr. Gbadouwey filled out a Pulmonary Impairment Questionnaire, identifying Plaintiff's medical condition as COPD and his prognosis as fair. (Tr. 589-595). The clinical finding that supported his diagnosis was shortness of breath, and the laboratory and diagnostic test results that supported his diagnosis were pulmonary function tests and a six minute walk study that were performed in December of 2010. (Tr. 590-591). Dr. Gbadouwey indicated that cold air, a change in the weather, and upper respiratory infections exacerbated Plaintiff's COPD, and that the nature and severity of the COPD was episodic lasting, on average, two (2) to three (3) weeks. (Tr. 591). He stated that Plaintiff's symptoms and functional limitations were reasonably consistent with the COPD. (Tr. 592). He opined that, in an eight (8) hour workday, Plaintiff could sit for eight (8) hours and stand or walk for one (1)

hour. (Tr. 592). He also opined that Plaintiff could frequently lift and carry up to ten (10) pounds, occasionally lift and carry up to twenty (20) pounds, and never lift or carry anything over twenty (20) pounds. (Tr. 592). Dr. Gbadouwey opined that Plaintiff's symptoms were seldom severe enough to interfere with attention and concentration, and that he expected Plaintiff's impairments to last at least twelve (12) months. (Tr. 594). He opined that Plaintiff would need to be able to take unscheduled breaks to rest once every hour during an eight (8) hour workday for ten (10) to fifteen (15) minutes at a time, and that he needed to avoid extreme temperatures. (Tr. 594). He opined that Plaintiff's COPD was likely to produce "good days" and "bad days," and that it would likely cause him to be absent from work about two (2) to three (3) times a month. (Tr. 594).

On July 14, 2012, Plaintiff underwent pulmonary function tests. (Tr. 602). These tests revealed a moderate obstructive ventilatory defect, air trapping, no restrictive ventilatory defect, and a mild reduction in diffusion capacity, uncorrected for Plaintiff's hemoglobin. (Tr. 602).

On September 10, 2012, Dr. Sneider wrote a letter, which gave the background of her treatment of Plaintiff after he experienced a stroke in December of 2009. (Tr. 616). She stated that Plaintiff continued to have problems with left-sided weakness, poor balance, decreased strength, and an abnormal gait pattern,

but that physical therapy improved his strength and endurance.  (Tr. 616).  Dr.

Sneider opined that Plaintiff's condition was likely to exceed twelve (12) months,

most likely for the next year.  (Tr. 616).  Dr. Sneider stated that Plaintiff's

diagnosis was post stroke syndrome, and that his medications included Aspirin,

Lisinopril, Simvastatin, Lopressor, Advair, Spiriva, and Ventolin.  (Tr. 616).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of

all legal issues decided by the Commissioner.  See Poulos v. Commissioner of

Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of

Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55

F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's

findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those

findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d

1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

Factual findings which are supported by substantial evidence must be upheld.  42

U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where

the ALJ's findings of fact are supported by substantial evidence, we are bound by

those findings, even if we would have decided the factual inquiry differently.");

Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the

Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the

record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340

U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the

Commissioner ignores countervailing evidence or fails to resolve a conflict

created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence.  Johnson, 529 F.3d at 203; Cotter, 642 F.2d

at 706-07.  Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir.

1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive DIB and SSI, the plaintiff must demonstrate he/she is "unable to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than twelve

months."  42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905 (defining disability).

Further,

> an individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which

exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits. See 20 C.F.R. § 416.920. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe[8] or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the RFC to return to his or her past work and (5) if not, whether he or she can adjust to other work in the national economy. Id. "The claimant bears the ultimate burden of establishing steps one through four." Poulos, 474 F.3d at 92,

---

8. An impairment is severe if it significantly limits an individual's physical or mental ability to do basic work activities. 20 C.F.R. § 416.920. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "seeing, hearing, and speaking;" "[u]nderstanding, carrying out, and remembering simple instructions;" "[u]se of judgment;" "[r]esponding appropriately to supervision, co-workers and usual work situations;" and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 416.921.

citing <u>Ramirez v. Barnhart</u>, 372 F.3d 546, 550 (3d Cir. 2004).

As part of step four, when a claimant's impairment does not meet or equal a listed impairment, the Commissioner will assess the RFC. <u>See</u> 20 C.F.R. § 416.920. RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The RFC assessment must include a discussion of the individual's abilities. <u>Id.</u>; 20 C.F.R. §§ 404.1545 and 416.945; <u>Hartranft</u>, 181 F.3d at 359 n.1 ("'[RFC]' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

Using the RFC assessment, the Commissioner will determine whether the claimant can still perform past relevant work, or can make an adjustment to other work. <u>Id.</u> If so, the claimant is not disabled; and if not, he is disabled. <u>Id.</u> "At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and [RFC]. " <u>Id.</u>

32

## ALJ DECISION

Initially, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2010.  (Tr. 14).  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from his onset date of December 4, 2009.  (Tr. 14).

At step two, the ALJ determined that Plaintiff suffered from the severe impairment of a "left-sided weakness post cerebrovascular accident, lumbar degenerative disc disease, emphysema, substance abuse, and chronic obstructive pulmonary disease (20 C.F.R. 404.1520(c) and 416.920(c))."  (Tr. 14).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  (Tr. 15).

At step four, the ALJ determined that Plaintiff had RFC to perform less thank a full range light work as defined in 20 CFR § 404.1567(b) and 416.967(b) with the following limitations:

> [Plaintiff] is capable of occasionally lifting and carrying 20 pounds and frequently lifting and carrying up to 10 pounds. [Plaintiff] is capable of standing or walking for one hour, and

sitting for eight hours, in an eight-hour workday.

(Tr. 16).  In consideration of Plaintiff's RFC, the ALJ determined Plaintiff was

unable to perform any past relevant work.  (Tr. 20).

At step five, the ALJ found that given Plaintiff's age, education, work

experience, and RFC, there were jobs that existed "in significant numbers in the

national economy that Plaintiff could perform (20 C.F.R. 404.1569, 404.1569(a),

416.969, and 416.969(a))."  (Tr. 20).

The ALJ concluded that Plaintiff was not under a disability as defined in the

Social Security Act at any time between the onset date of December 4, 2009, and

the date of the ALJ's decision.  (Tr. 21).

## DISCUSSION

On appeal, Plaintiff challenges the ALJ's decision on the following

grounds: (1) the ALJ failed to properly weigh the medical evidence; and (2) the

ALJ erred to properly evaluate Plaintiff's credibility.  (Doc. 12, p. 11).   Defendant

disputes these contentions.  (Doc. 15, pp. 16-26).

### 1.    Medical Opinion Weight

Plaintiff asserts that the ALJ erred in assigning minimal weight to the

opinion of Plaintiff's treating physician, Dr. Sneider, moderate weight to the

opinions of Dr. Vandergriff, Dr. Gbadouwey, and the state agency medical

consultant, and significant weight to the opinions of Dr. Albright, Dr. Ladd, and

Dr. Zwemer. (Doc. 12, pp. 12-13). More specifically, Plaintiff argues that the

ALJ erred in its reasoning of giving minimal weight to Dr. Sneider's opinion,

which was that it was inconsistent with what Plaintiff himself testified he was

capable of doing. (Id. at 13-14). Plaintiff asserts that this reason was not

sufficient enough to give Dr. Sneider's opinion minimal weight because the

Plaintiff was testifying as to what he could do while at home, not in a competitive,

five (5) day a week work environment on a sustained basis. (Id.). Plaintiff

upholds this argument with case law from the United States District Court for the

Eastern District of New York, which held that "the ALJ erred by failing to

recognize the physician assessed Plaintiff's work capacity in the context of a five

day work week, as here, and instead assumed the capacity would leave the

claimant "bed-bound," which was not otherwise supported by the record." (Id.).

Plaintiff also asserts that the ALJ did not question the severity or validity of the

clinical or diagnostic findings of Dr. Sneider that supported the facial droop, left-

sided weakness, and gait dysfunction Plaintiff experienced and that were

consistent with the record. (Id. at 14).

　　　Plaintiff further argues that the ALJ improperly gave significant weight to

the following opinions: (1) Dr. Ladd because he simply interpreted x-ray results of

Plaintiff's spine and did not offer an opinion as to Plaintiff's functional limitations; (2) Dr. Zwemer because she was not a medical doctor, but in fact was a physical therapist, which is not a profession that is considered to be an acceptable medical source, and because she did not offer an opinion as to Plaintiff's functional limitations; and (3) Dr. Albright because he opined that Plaintiff was disabled for a period of twelve (12) or more months, which does not support the ALJ's conclusion that Plaintiff could less than a full range of light work.  (Doc. 12, pp. 14-15).

With regards to the moderate weight given to several medical opinions, Plaintiff asserts that: (1) the opinion of Dr. Gbadouwey does not support the ALJ's RFC finding because Dr. Gbadouwey opined that Plaintiff needed to rest once every hour for ten (10) to fifteen (15) minutes; (2) the opinion of Dr. Vandegriff does not support the ALJ's RFC determination because the ALJ improperly excluded the part of this opinion that stated Plaintiff could only occasionally bend or kneel, and never stoop, crouch, balance, or climb ; and (3) the ALJ relied too heavily on the opinion of the non-examining state agency consultant Dr. Brenner because the Third Circuit Court of Appeals has cautioned against relying on such an opinion in the presence of well-supported contradictory evidence.  (Doc. 12, p. 17).  Thus, Plaintiff contends that none of the evidence from these other medical

sources contradicted the opinion of Dr. Sneider, and, as a result, Dr. Sneider's

opinion should not have been given minimal weight.  (Id. at 16).

The preference for the treating physician's opinion has been recognized by

the Third Circuit Court of Appeals and by all of the federal circuits.  See, e.g.,

Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).  This is especially true

when the treating physician's opinion "reflects expert judgment based on a

continuing observation of the patient's condition over a prolonged time."

Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR §

416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you

and the more times you have been seen by a treating source, the more weight we

will give to the source's medical opinion.").  If a "treating source's opinion on the

issue(s) of the nature and severity of [Plaintiff's] impairment(s) is well-supported

by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [Plaintiff's] case record, [the

Commissioner] will give it controlling weight."  20 C.F.R. §§ 404.1527( c)(2) and

416.927( c)(2).

However, when the treating physician's opinion conflicts with a non-

treating, non-examining physician's opinion, the ALJ may choose whom to credit

in his or her analysis, but "cannot reject evidence for no reason or for the wrong

reason." <u>Morales</u>, 225 F.3d 316-18.  It is within the ALJ's authority to determine

which medical opinions he rejects and accepts, and the weight to be given to each

opinion.  20 C.F.R. § 416.927.  The ALJ is permitted to give great weight to a

medical expert's opinion if the assessment is well-supported by the medical

evidence of record.  <u>See</u> <u>Sassone v. Comm'r of Soc. Sec.</u>, 165 F. App'x 954, 961

(3d Cir. 2006) (holding that there was substantial evidence to support the ALJ's

RFC determination that the plaintiff could perform light work, even though this

determination was based largely on the opinion of one (1) medical expert, because

the medical expert's opinion was supported by the medical evidence of record);

<u>Baker v. Astrue</u>, 2008 U.S. Dist. LEXIS 62258 (E.D. Pa. Aug. 13, 2008).

However, the ALJ cannot base the rejection of a treating physician's opinion

based on "his or her own credibility judgments, speculation or lay opinion."

<u>Morales</u>, 225 F.3d at 317-18.

　　　Regardless, the ALJ has the duty to adequately explain the evidence that he

rejects or to which he affords lesser weight.  <u>Diaz v. Comm'r of Soc. Sec.</u>, 577

F.3d 500, 505-06 (3d Cir. 2009) (holding that because the ALJ did not provide an

adequate explanation for the weight he gave to several medical opinions, remand

was warranted).  "The ALJ's explanation must be sufficient enough to permit the

court to conduct a meaningful review."  <u>In re Moore v. Comm'r of Soc. Sec.</u>, 2012

U.S. Dist. LEXIS 100625, *5-8 (D.N.J. July 19, 2012) (citing <u>Burnett v. Comm'r</u>

<u>of Soc. Sec.</u>, 220 F.3d 112, 119-20 (3d Cir. 2000)).

With regards to the medical opinion evidence, the ALJ stated the following:

> The undersigned gives significant weight to the medical
> opinions of Dr. Albright, Dr. Ladd, and Dr. Zwemer, whose
> opinions correspond with [Plaintiff's] testimony regarding his
> retained ability to walk, stand, stoop, crouch, balance, and
> breathe without difficulty.  In the light of [Plaintiff's]
> admissions, the undersigned gives moderate weight to the more
> restrictive medical opinions of the State agency medical
> consultant, Dr. Gbadouwey, and Dr. Vandergriff.  Finally,
> minimal weight is given to the opinions of Dr. Sneider, who
> found [Plaintiff] incapable of pushing, pulling, kneeling,
> bending, and stooping, and also noted that [Plaintiff] was
> incapable of standing, walking, or sitting for more than one
> hour in an eight-hour workday because [Plaintiff] credibly
> testified that he is able to perform those activities, does not
> have days when he doesn't get out of bed and only every once
> in a while he may nap in the afternoon for a maximum of 20
> minutes to a half hour.  The State agency single decision
> maker's determination regarding [Plaintiff's] impairments is
> given little weight, as she is not an acceptable medical source.

(Tr. 19-20).

Upon review of this determination issued by the ALJ, while the ALJ was

correct that Plaintiff's testimony as to what he was able to do discredited and was

inconsistent with some portions of the opinions rendered by the aforementioned

medical sources, it is determined that the ALJ erred in the weight she afforded to

the aforementioned medical sources.  The ALJ erred in the significant weight she

afforded to three (3) opinions.  First, she erred in assigning significant weight to

Dr. Ladd's "opinion" because he did not render an opinion as to Plaintiff's

functional limitations, but rather interpreted an x-ray.  (Tr. 512).  Secondly, she

erred in assigning significant weight to the opinion of "Dr. Zwemer" because she

is in fact a physical therapist, and thus not an acceptable medical source[9] whose

opinion can be taken into consideration by the ALJ in determining Plaintiff's RFC.

See 20 C.F.R. § 404.1527(a)(2).[10]  (Tr. 605-608).  Moreover, she did not offer an

---

9.
       (a) Sources who can provide evidence to establish an
       impairment.  We need evidence from acceptable medical
       sources to establish either you have a medically determinable
       impairment(s).  See § 404.1508.  Acceptable medical sources
       are - -

          (1) Licensed physicians (medical or osteopathic doctors);

          (2) Licensed or certified psychologists. [];

          (3) Licensed optometrists . . . [];

          (4) Licensed podiatrists . . . []; and

          (5) Qualified speech-language pathologists . . . []

20 C.F.R. § 404.1513(a)(1-5)

10.
       Evidence that you submit or that we obtain may contain
       medical opinions. Medical opinions are statements from
       physicians and psychologists or other acceptable medical

opinion as to Plaintiff's functional limitations.  (Tr. 605-608).  Lastly, the ALJ

erred in giving significant weight to Dr. Albright's opinion because he provided

medical evidence regarding Plaintiff's impairments, but did not render an opinion

as to the functional limitations Plaintiff experienced as a result of these

impairments aside from the Department of Public Welfare form on which he stated

Plaintiff was disabled for at least twelve (12) months.[11]  (Tr. 425).

The ALJ also erred in affording moderate weight to the following opinions:

(1) Dr. Vandergriff's opinion because it was rendered in October of 2009, before

Plaintiff's amended alleged onset date of December 4, 2009, the date on which

_____

> sources that reflect judgments about the nature and severity of
> your impairment(s), including you symptoms, diagnosis and
> prognosis, what you can still do despite your impairment(s),
> and your physical or mental restrictions.

 20 U.S.C. § 404.1527(a)(2).

11.  It is acknowledged that the ALJ did not have to find Plaintiff disabled based
on Dr. Albright's opinion pursuant to the following Social Security Regulation:

> Opinions that you are disabled.  We are responsible for making
> the determination about whether you meet the statutory
> definition of disability.  In doing so, we review all of the
> medical findings and other evidence that support a medical
> source's statement that you are disabled.  A statement by a
> medical source that you are "disabled" or "unable to work"
> does not mean that we will determine that you are disabled.

20 C.F.R. § 404.1527(d)(1).

Plaintiff experienced a stroke that caused residual left-sided weakness supported

by the record; and (2) the opinions of Dr. Gbadouwey and Dr. Brenner because it

appears the ALJ "cherry picked"[12] limitations from this opinion in order to support

her RFC determination.  Dr. Gbadouwey opined that Plaintiff required breaks once

an hour for ten (10) to fifteen (15) minutes at a time, and Dr. Brenner opined that

Plaintiff was only capable of standing and/ or walking for up to only four (4) hours

and sitting for up to only six (6) hours.  (Tr. 125-127, 594).  These functional

limitations as opined do not support the ALJ's RFC determination that Plaintiff

could stand and/ or walk for one (1) hour without mention of the need for a break

and sit for eight (8) hours in an eight (8) hour workday.  (Tr. 16).  Furthermore,

Dr. Brenner's RFC assessment was not based on Plaintiff's entire medical record

as Plaintiff had several appointments after Dr. Brenner rendered his opinion in

May of 2011.  (Tr. 536, 539, 567, 596, 599, 602, 616); See Sassone, 165 F. App'x

954, 961 (3d Cir. 2006) (holding that in order for the ALJ to properly give any

weight to a medical opinion, the entire medical record must have been available

for and reviewed by the non-examining, non-treating physician).

     Moreover, the ALJ erred in giving minimal weight to Plaintiff's treating

---

12. The Third Circuit Court of Appeals has held that an ALJ may not exclude
certain parts of a medical opinion and rely only on "the pieces of the examination
reports that support his determination."   Morales, 225 F.2d at 318.

physician, Dr. Sneider, because, upon review of the record, Dr. Sneider's opinion was supported by the medical record, including clinical and diagnostic records, and was consistent with the objective medical evidence.  (Tr. 125-127, 424-425, 431-432, 465, 468, 470, 473, 560, 567-574, 590-591, 594, 607-608, 616).   While the ALJ is correct that Plaintiff's testimony contradicts some of the functional limitations as opined by the aforementioned physicians, the fact remains that the ALJ erred in the assignment of weight to the medical opinions because: (1) she assigned significant weight to an unacceptable medical source and to physicians who did not actually render medical opinions as to Plaintiff's functional limitations, aside from Dr. Albright's opinion that Plaintiff was, in fact, disabled; (2) she assigned moderate weight to an opinion that predated Plaintiff's amended alleged onset date and to opinions from which she "cherry-picked" limitations to support her determination; and (3) she failed to point to evidence that contradicted Dr. Sneider's opinion.  As such, it is determined that the ALJ's RFC determination is not supported by substantial evidence.

## CONCLUSION

The Court's review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.  Therefore, pursuant to 42 U.S.C. § 405(g), Plaintiff's appeal will be granted, the decision of the

Commissioner will be vacated, and the case will be remanded to the

Commissioner for further proceedings.

     A separate Order will be issued.

**Date**: April 14, 2015

                              **/s/ William J. Nealon**
                              **United States District Judge**